1

2                                                                                    O

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                         CENTRAL DISTRICT OF CALIFORNIA

10

11    JOSE PEPE MITCHELL,                          Case No. 2:23-cv-02516-KES

12                    Petitioner,

13           v.                                     MEMORANDUM OPINION AND
                                                            ORDER
14    D. SAMUEL, Warden

15                    Respondent.

16

17

18                                          **I.**

19                               **INTRODUCTION**

20           On March 31, 2023, Petitioner filed a <u>pro</u> <u>se</u> Petition for Writ of Habeas

21    Corpus by a Person in State Custody (Dkt. 1 ("Petition")) and, on May 15, filed a

22    First Amended Petition (Dkt. 6 ("FAP")), raising two claims challenging his 2016

23    convictions for robbery, attempted robbery, and conspiracy.[1]  <u>See</u> <u>People v.</u>

24    <u>Mitchell</u>, No. B281476, 2019 WL 1498791 (Cal. Ct. App. Apr. 5, 2019).  On

25    _____

26          [1] Petitioner previously filed a federal habeas petition that was dismissed
      without prejudice.  <u>See</u> <u>Mitchell v. Johnson</u>, No. 2:20-cv-05358-MWF-KES (C.D.
27    Cal. filed June 16, 2020), Dkt. 1, 6, 7.

28

                                            1

1  November 2, 2023, Respondent filed an Answer.  (Dkt. 21.)  On December 11,

2  2023, Petitioner filed a Traverse.  (Dkt. 27.)  The parties consented to have the

3  undersigned conduct all proceedings in this case, including the resolution of all

4  dispositive matters.  (See Dkt. 23, 24.)  The matter, thus, stands submitted and

5  ready for decision.

6                                    **II.**

7                             **BACKGROUND**

8        On November 28, 2018, a Los Angeles County Superior Court jury in Case

9  No. YA091753 convicted Petitioner of two counts of second-degree robbery, three

10  counts of attempted second-degree robbery, and one count of conspiracy and found

11  him not guilty of one count of robbery.  (3 Clerk's Transcript ("CT") at 633-41.)[2]

12  In a bifurcated proceeding, the trial court found that Petitioner had suffered a prior

13  felony conviction.  (6 Reporter's Transcript ("RT") at 4217.)  He was sentenced to

14  21 years in state prison.[3]  (3 CT at 713.)

15        Petitioner appealed, raising both of the FAP's claims and a sentencing claim.

16  (See Lodged Document ("LD") 23.)  The California Court of Appeal affirmed the

17  judgment on November 11, 2018, in a reasoned decision.  (LD 1.)  Petitioner then

18  sought review in the California Supreme Court (LD 2, 3), which granted review

19  concerning the sentencing claim and ordered the court of appeal to vacate its

20  _____

21        [2] Except for citations to the Reporter's Transcript and Clerk's Transcript,
   page citations refer to the pagination imposed by the Court's electronic filing
22  system.

23        [3] In a separate case in Los Angeles County Superior Court (Case No.
   TA124565), Petitioner was found to have violated his probation by committing the
24  crimes of which he was convicted in Case No. YA091753.  (See LD 10 at 30-31.)
   Although neither of the FAP's claims concerns that finding, one of it claims alleges
25  that the jurors' exposure in Case No. YA091753 to the existence of the probation-
   violation case violated due process and deprived Petitioner of his right to a fair trial.
26  (See Dkt. 6 at 5, 121.)

27

28

                                        2

decision and "reconsider the cause in light of Senate Bill No. 1393" (LD 4), which gave California trial courts discretion to strike certain sentencing enhancements. See Mitchell, 2019 WL 1498791, at *1.   On reconsideration, the court of appeal remanded to the trial court to consider whether to exercise its discretion under Senate Bill No. 1393 but otherwise affirmed the judgment.  (LD 5 at 33.)  Petitioner again filed a petition for review in the California Supreme Court (LD 6), which denied review on June 12, 2019 (LD 7).[4]

On October 26, 2020, Petitioner filed a habeas petition in the superior court, which denied it in a reasoned decision.  (See LD 9 at 53-54.)  On September 12, 2021, he filed a second habeas petition in the superior court, which denied it in another reasoned decision.[5]  (See id. at 58, 60-61.)  On January 18, 2022, he filed a habeas petition in the court of appeal (LD 12), which denied it for failure to "state a prima facie basis for relief" (LD 13 (citations omitted)).  He has not filed any habeas petitions in the California Supreme Court.  See Cal. App. Cts. Case Info., http://appellatecases.courtinfo.ca.gov/ (search for "Jose" with "Pepe" and "Mitchell" in supreme court) (last visited Mar. 11, 2024).

---

[4] On remand, the trial court declined to strike the sentencing enhancement. (LD 9 at 52.)  Neither of the FAP's claims concerns that decision.  Accordingly, the Court omits the lengthy procedural history concerning Petitioner's unsuccessful efforts to overturn it.

[5] Respondent was unable to obtain copies of the habeas petitions that Petitioner filed in the superior court despite diligent efforts to do so.  (See Answer at 15 n.5.)  Petitioner, however, attached an undated habeas petition with no file stamp bearing the superior court's name and address on its caption page.  (See Dkt. 6 at 47-83.)  The Court cannot determine with certainty whether that petition was ever filed or, if it was, which reasoned decision by the superior court corresponds to it.  The Court need not resolve this issue because Petitioner exhausted the FAP's two claims on direct appeal (see LD 23), and there is a reasoned decision concerning those claims (LD 5).  Petitioner does not assert any other claim in the FAP.  (See Dkt. 6 at 5, 121.)

3

# III.

## FACTUAL BACKGROUND

The underlying facts are taken from the unpublished California Court of Appeal decision on Petitioner's direct appeal.  (LD 5 at 10-21); Mitchell, 2019 WL 1498791, at *5-10.  Unless rebutted by clear and convincing evidence, these facts are presumed correct.  Tilcock v. Budge, 538 F.3d 1138, 1141 (9th Cir. 2008); 28 U.S.C. § 2254(e)(1).  Because Petitioner challenges the sufficiency of the evidence, this Court has also conducted an independent review of the record.  See Jones v. Wood, 114 F.3d 1002, 1008 (9th Cir. 1997).

*The evidence and testimony received at the second trial revealed the following material facts.*[6]

    *a.*    <u>*The initial robberies in Torrance*</u>

*On the afternoon of June 27, 2014, Jeannie Kim went to a branch of BBCN Bank located on Sepulveda Boulevard in Torrance.  After completing her business, she went out to her car and placed her purse behind the driver's seat.  Ms. Kim then drove to her home in Torrance and pulled into her garage.  When Ms. Kim got out of the car, a young African-American male whom she did not know was standing inside her garage very close to her car.  He demanded her purse. Ms. Kim refused.  The man demanded her purse again and, this time, pointed a gun at her and pushed her.  She stepped backward and fell.  Ms. Kim saw the man reach behind her front driver's seat, grab her purse and run to a white car in the street. The man got into the front passenger seat.  Ms. Kim did not get a look at the driver. She got back into her car and attempted to pursue the white car as it fled, but she was unable to keep up with it.  Ms. Kim testified she was not sure if [Petitioner]*

---

[6] Petitioner's first trial ended in a mistrial after the jurors were unable to reach a verdict.  See Mitchell, 2019 WL 1498791, at *1.

*was the man who took her purse.*

*A couple of weeks later, on July 11, 2014, Su Jin Lim left the BBCN Bank in Gardena, drove to her home in Torrance, and parked her white Toyota Camry in her driveway. Ms. Lim got out of the car carrying a small, pink backpack that contained several items, including her cell phone and bank cards, and went to get something out of her trunk. While she was standing at her open trunk, an African-American male, in his 20's or 30's, came up to her and told her not to make any noise. Ms. Lim screamed, and the man hit her in the side of her head with a hard object that felt metallic. She screamed again for help and tried to hold on to her backpack, but the man wrested it away from her. He then jumped into a brown-colored car that was waiting at the end of her driveway and fled. Ms. Lim was bleeding from the wound to her head and required medical attention. Ms. Lim was unable to identify [Petitioner] in court.*

*James Chen lived on the same street as Ms. Lim. He and his wife had just pulled out of their driveway on their way to dinner when Mrs. Chen said she heard a scream. Mr. Chen looked in the direction his wife pointed and saw Ms. Lim at the end of her driveway, struggling with a dark-skinned man, wearing a baseball cap. The man jumped into an older model, brown-colored Honda. The Honda drove off in the opposite direction, so Mr. Chen made a U-turn and tried to chase it. The Honda ran through several stop signs, so Mr. Chen was unable to catch up or get a license plate number.*

*Detective Jeff Livingston of the Torrance Police Department investigated the similar "follow home" robberies involving Jeannie Kim and Ms. Lim. Detective Livingston learned that the Chen's home had security cameras. He obtained the video footage from those cameras which showed Ms. Lim's white Camry driving down the street just before the time of the robbery, followed by a brown-colored Honda and a red car with black rims. Shortly thereafter, the footage showed the*

1    *red car and brown Honda driving back down the street in the opposite direction.*
2    *Detective Livingston showed the footage to Detective Dariusz Wawryk, who agreed*
3    *that it appeared the two cars may have been involved in the robbery.*

4         *Detective Livingston contacted Detective Michael Ross of the Gardena*
5    *Police Department and inquired about the video footage from Gardena's traffic*
6    *cameras located in the vicinity of the BBCN Bank for the afternoon of July 11,*
7    *2014.  Detective Livingston asked Detective Ross to look for images of a white*
8    *Camry, a brown Honda, and a red car with a black top and black rims.  Detective*
9    *Ross found footage showing a white Camry travelling south on Normandie Avenue*
10   *not far from the BBCN Bank, with a brown car (or one with rusted or oxidized*
11   *paint) and a red car with a black top following in fairly close proximity.  Both*
12   *Detective Livingston and Detective Wawryk believed the cars looked similar to*
13   *those captured by the Chen's home security cameras.*

14        *In August, Ms. Lim emailed Detective Livingston the monthly statement for*
15   *her cell phone.  The statement showed that on July 11, a few hours after she was*
16   *robbed, her phone was used to make a call to a phone number she did not*
17   *recognize (ending -8143).  After obtaining a search warrant, Detective Livingston*
18   *determined that phone number belonged to an individual named Darian Baber.*

19        *Detective Livingston and Detective Wawryk also obtained access to Baber's*
20   *Facebook account.  On June 27, 2014, the date Jeannie Kim was robbed, Baber*
21   *posted a selfie on his Facebook page.  In the photograph, Baber is sitting in a car*
22   *holding numerous $ 100 bills, and a Hispanic male is visible in the back seat.*
23   *Baber's appearance in the photograph fit the general description of the suspect*
24   *given by Ms. Kim, and the money stolen from her that day had been the same*
25   *denomination ($100 bills).*

26        *In response to these leads, the Torrance Police Department initiated*
27   *surveillance of Baber.  While the detectives were watching Baber's house in*

28

*Inglewood, they saw a red car (similar to the one captured on the Chen's security footage and the Gardena traffic cameras) arrive and park outside.  The car was a red Infiniti sedan with a black top and black rims.  After checking the license plate number, they determined [Petitioner] was the registered owner of the car.  The police later saw [Petitioner] and Baber talking to each other on multiple occasions, and [Petitioner] was identified as a "friend" on Baber's Facebook page.*

> b.    *The Culver City incidents*

*On the afternoon of November 25, 2014, Lydia Kim left the Hamni Bank at 3737 West Olympic Boulevard and went to meet a client at a business called Master's Golf.  She parked her car in the lot and headed toward the entrance of the building.  When she got near the door, the manager of Master's Golf came out to meet her and asked why she had come with an African-American male.  She was scared as she did not realize someone was walking near her, so she quickly went inside the building.  The African-American man turned and walked away.  Ms. Kim was unable to identify [Petitioner] in court because she had never seen the man's face.  During her testimony, Ms. Kim looked at video footage from a nearby security camera that captured the encounter.  She identified herself as the person being followed by an African-American male wearing a construction vest, who then left in a black car after she entered Master's Golf.*

*Later that same day, Young Ok Hwang also conducted business at the same branch of Hamni Bank.  She withdrew $7,000, placed the money in her purse, and then drove to her home on Whitburn Avenue in Culver City.  By the time she arrived home, and parked in her driveway, it was dark outside.  Ms. Hwang grabbed her purse, removed a piece of luggage from her trunk, and then walked to the end of her driveway to get her mail.  Before she got to her mailbox, an African-American male suddenly appeared and ran toward her.  He was wearing a construction worker's vest.  He grabbed her purse, and Ms. Hwang struggled with*

1   *him.  She was too shocked and scared to scream.  The man wrested the purse from*

2   *her and ran to the street.  Ms. Hwang then cried out for help.  The man jumped into*

3   *the passenger side of a black car and the car sped off.*

4   *Detective Ryan Thompson of the Culver City Police Department investigated*

5   *the incidents involving Lydia Kim and Ms. Hwang.  Detective Thompson obtained*

6   *the video surveillance footage from the business located next to Master's Golf.  The*

7   *video showed the arrival of Ms. Kim, an African-American man following her, and*

8   *a red car making a U-turn and pulling up near the driveway, followed by a black*

9   *car that parked in the lot.*

10  *Detective Thompson also spoke with Anthony Canchari, a witness to the*

11  *robbery of Ms. Hwang.  Mr. Canchari said he was standing at a nearby corner*

12  *when he saw an African-American male get out of a maroon-colored car and head*

13  *in the direction of Whitburn Avenue.  Mr. Canchari then heard a woman scream.*

14  *The African-American male ran back to the maroon car and got in.  The driver of*

15  *the car turned off the headlights and fled the area. A black car followed.  When*

16  *Detective Thompson showed Mr. Canchari some photographs, he identified*

17  *[Petitioner's] red Infiniti and signed his name on the photograph, noting "This car*

18  *looks familiar."*

19  *At trial, Ms. Hwang identified the construction vest recovered from*

20  *[Petitioner] as the "same vest" she had seen on the man who robbed her.  Ms.*

21  *Hwang identified [Petitioner] in court as the person who took her purse.  She*

22  *admitted she had testified in the first trial that she was not sure if [Petitioner] was*

23  *the one who robbed her.  Ms. Hwang explained she had done so because she was*

24  *scared [Petitioner] would seek revenge against her.  Ms. Hwang said she wanted to*

25  *just tell the truth even though she was still a little afraid to do so.  When asked on*

26  *redirect, Ms. Hwang reiterated she had previously equivocated about [Petitioner's]*

27  *identification out of fear.  The prosecutor asked again if she believed [Petitioner]*

28

8

*was the person who stole her purse, and she said "yes, I think so."  The prosecutor asked, "are you sure?"  Ms. Hwang responded, "yes."*

c.   *The surveillance operation*

*The Torrance Police Department began a surveillance operation, supervised by Detective Eric Williams, that involved several plain clothes detectives, including Detective Wawryk and Detectives Brent Clissold and Scott Nakayama.  The undercover detectives, working in teams, drove unmarked cars and documented the activities of [Petitioner] (as well as Baber and Villanueva) on multiple days over a period of months.*

*According to Detective Clissold, the activities of [Petitioner], Baber and Villanueva followed a regular pattern.  [Petitioner] was usually observed driving his red Infiniti, while Baber would be in a separate car with a third person (usually Villanueva).  The two cars would follow each other to one of the branches of Hamni Bank or BBCN Bank ("like they're trailing each other"), park and then wait in an area where the bank's front doors and parking lot were visible.  After a customer would leave the bank, the two cars, driving "in tandem," would follow the customer to their home or place of business.  They always drove this way, travelling in proximity to each other, making the same turns and leaving locations at the same time.  All of the known victims and potential victims were Asian females.*

*On the afternoon of December 8, 2014, [Petitioner] was observed by Detective Williams parking his car near the Hamni Bank at 3737 West Olympic Boulevard.  [Petitioner] got out of the car and put on a "caution" or construction vest.  Detective Nakayama was also surveilling [Petitioner] and saw him walking near the bank talking on his cell phone.  At some point, a female customer left the bank in a white Lexus sports utility vehicle, and [Petitioner], in his car, immediately "shadow[ed]" her, along with Baber and a third person (possibly Villanueva) in a black Infiniti.  Jieun Kim was the driver of the Lexus.  The two cars*

*followed Ms. Kim's Lexus "in tandem" until it pulled into her garage which was protected by two separate security gates. Both [Petitioner] and the black Infiniti pulled over and parked at the curb. After a few moments, they both drove off.*

*On December 17, 2014, Soon J. Le left the Hamni Bank on 3099 West Olympic Boulevard and headed back to work in her Honda Pilot. She pulled into the covered parking structure and found a parking spot. She noticed a car behind her with two occupants. The driver appeared to be a Hispanic male. She gestured for them to move so she could back her car up a bit and straighten it in the parking space. Ms. Le then got out of her car, gave her key to the parking attendant and went inside.[FN]*

> *FN.  Ms. Le was unavailable to testify at the second trial, so her testimony from the first trial was read into the record. Ms. Le had been unable to identify [Petitioner] in court at the first trial.*

*This encounter was observed by detectives Clissold, Williams, Nakayama and Wawryk who were working surveillance that day. Detective Clissold saw [Petitioner] in his red Infiniti at a gas station on Olympic Boulevard. Baber and Villanueva arrived in a white Honda shortly thereafter. The three men spoke together briefly. Baber and Villanueva got back into the Honda and left the gas station. [Petitioner] followed. The detectives trailed the two cars to where they both parked across the street from the Hamni Bank on 3099 West Olympic Boulevard. Detective Williams noted the subjects had parked in areas with a "good visual" of the front of the bank and the parking lot.*

*After sitting outside the bank in their respective cars for awhile, [Petitioner], Baber and Villanueva drove off, following a female customer in a blue Honda Pilot, who the detectives later learned was Ms. Le. Detective Williams saw Villanueva and Baber in the white Honda follow Ms. Le into a covered parking structure. [Petitioner], in his red Infiniti, parked at the curb a short distance from the*

*driveway.  Detective Williams double-parked several car lengths behind [Petitioner].  [Petitioner's] driver side window was rolled down and Detective Williams could see [Petitioner], somewhat slouched down, looking at him in his driver's side mirror.  After a few minutes the white Honda came out of the parking structure and drove off, as did [Petitioner].*

*Meanwhile, the detectives had determined that the white Honda, driven by Villanueva, had been reported stolen.  A patrol car, not involved in the surveillance operation, drove past in the opposite direction and made a U-turn, apparently noting the stolen vehicle.  Both [Petitioner] and the white Honda immediately made an evasive move, turning onto a side street.  Baber and Villanueva abandoned the white Honda.  The detectives called off the patrol car so as to not interfere with their surveillance operation.  The detectives saw Baber and Villanueva being picked up by [Petitioner] in the red Infiniti.*

*That same day, the detectives also observed [Petitioner], Baber and Villanueva make several other unsuccessful attempts to rob female victims, and several vehicle burglaries.*

*Detective Williams later interviewed Ms. Le who reported the two men who had pulled in behind made her nervous because they were staring at her and her car, and it was unusual to see anyone who was not Asian in the parking structure since everyone with whom she worked was Asian.  Therefore, she said that when she got out of her car she immediately went over to the parking attendant and went inside.*

*d.      [Petitioner's] pretrial statement*

*[Petitioner] was arrested on December 19, 2014. [Petitioner's] cell phone was taken into evidence, as was a construction or safety vest located in the trunk of his car.  While in custody, [Petitioner] waived his right to remain silent, did not ask to speak to an attorney and gave a statement to Detective Wawryk.  The statement*

11

*was recorded and a redacted portion was played for the jury.*

*[Petitioner] identified his cell phone and confirmed his phone number ending -2215.  [Petitioner] also confirmed he owned the red Infiniti with the black top and black rims.*

*Detective Wawryk asked [Petitioner] why he would be participating in these robberies when he had a job, particularly with a gun involved where someone would eventually get hurt.  [Petitioner] responded, "There's no gun (inaudible) I'm not bullshit [sic] you.  Nobody has a gun."  In response to being asked why there would be long periods in between some of the robberies, [Petitioner] said, "Didn't want to do it."  [Petitioner] asked several times if there was anything he could do to help himself, including asking if he could provide information.  "No snitching in the world to get me out of this, huh, not even no wire informant?"*

*Detective Wawryk explained that he had to present the case to the district attorney, that he was not the person who could make any type of deal, but that he could tell the district attorney that [Petitioner] was remorseful or otherwise.  He said, "you tell me . . . how did you feel?"  [Petitioner] said, "I was raised better than this."*

*Detective Wawryk told [Petitioner] he was on videotape.  "[Y]ou were there. I got you — I got you on surveillance, neighbor's house, and I got you on surveillance . . . .  Leaving the BBCN in Gardena, going down Normandie, you — you got to realize there's frickin [sic] surveillance video all over the streets; you know what I mean?  So am I — am I bullshitting you?"  [Petitioner] responded, "not really."*

*Detective Wawryk again told [Petitioner] they had a lot of security camera footage and other evidence implicating him and his "crew," enough to charge him on three completed robberies and four attempted robberies.  [Petitioner] responded, "Just give me a charge for attempted.  Are . . . you charging me?"*

*[Petitioner] continued to deny personally taking anything from anyone. "I never robbed." Detective Wawryk said, "but you were — you were part of the crew." [Petitioner] interjected, "I'm saying I never robbed nobody." Detective Wawyrk explained, "You were part of the crew. You guys were working in concert together. You were identifying victims for them. You were following people from the bank. You were setting up on one side of the street; they set up on the other and yeah, they pop out of the car. They complete the robbery but you were part of the crew; you know what I mean? You can't deny that."*

*[Petitioner], responded: "Yeah, but you're — but I'm being charged with actual robbery." Detective Wawryk said, "well, the crew, the whole crew is charged with the robbery." To which [Petitioner] asked, "Is that how they (inaudible)." Detective Wawryk said, "Yeah, that's how it is, yeah."*

*Later on, near the end of the interview, [Petitioner] asked, "If I give you the rest of the information that you need, . . . what type of deal do I have to work out for me?" [Petitioner] eventually said he did not think it was going to help his situation, but he could tell them where "some stuff" was in storage. He then asked if they took anything from his mother's house. It was near Christmas time and he asked, "[y]ou didn't take the presents, though, because some of that stuff I didn't steal, actually, but."*

    e.   <u>Cell phone records</u>

*Detective Thompson testified as an expert in cell phone technology and cell phone record analysis. In looking at the records for [Petitioner's] cell phone and Baber's cell phone, he determined that on the dates of four of the incidents, there was regular communication between their two phones. There were 14 calls between them on June 27, the date of the robbery of Ms. Kim in Torrance. There were 22 calls on July 11, the date of the robbery of Ms. Lim in Torrance. And, on November 25, the date of the attempt on Ms. Kim at Master's Golf and the robbery*

*of Ms. Hwang in Culver City, there were also 22 calls between them.*

*Detective Thompson further testified that the GPS tracking for the two cell phones showed the phones were used to make calls in the vicinity of the banks or the victims' homes during several of the incidents.  He explained that when a cell phone is used to make a call, it will "ping" or be documented as within the coverage area of a particular cellular phone tower.*

*In analyzing the records for [Petitioner's] cell phone, Detective Thompson opined that [Petitioner's] cell "phone [was] pinging in the area of these banks where these victims [were] leaving from and [were] generally speaking, heading towards the areas where these victims lived.  [¶]  Right after they're robbed, the phone appears to move away from where the victims live[d] towards where [Petitioner] reside[d]."*

    *f.   Defense evidence*

*[Petitioner] did not testify and did not call any witnesses.*

(LD 5 at 10-21.)

**IV.**

**GROUNDS FOR RELIEF**[7]

1.    The trial court violated due process and deprived Petitioner of his right to a fair trial by denying his motions for mistrial based on the jurors' exposure to extrinsic information concerning his probation-violation case.  (Dkt. 6 at 5, 121.)

2.    There was insufficient evidence to support Petitioner's convictions for conspiracy, robbery, and attempted robbery.  (Id.)

---

[7] Petitioner's presentation of his claims is somewhat unclear (See Dkt. 6 at 121), but construed liberally, see Woods v. Carey, 525 F.3d 886, 889-90 (9th Cir. 2008) (district courts are obligated to liberally construe pro se litigant filings), he appears to assert the same challenges to his convictions that he raised on direct review.  (Compare Dkt. 6 at 121, with LD 23 at 2-3.)

14

1

2

**V.**

**STANDARD OF REVIEW**

3

4

5

6

7

8

9

10

11

12

13

14

15

Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant a writ of habeas corpus on behalf of a person in state custody "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  As explained by the Supreme Court, § 2254(d)(1) places a "constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court."  <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000).  In <u>Williams</u>, the Court held that:

16

17

18

19

20

21

22

23

24

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

25

26

27

<u>Id.</u> at 412-13; <u>see</u> <u>Weighall v. Middle</u>, 215 F.3d 1058, 1061-62 (9th Cir. 2000) (discussing <u>Williams</u>).  A federal court making the "unreasonable application" inquiry asks "whether the state court's application of clearly established federal law

28

was objectively unreasonable." <u>Williams</u>, 529 U.S. at 409; <u>Weighall</u>, 215 F.3d at 1062.  The <u>Williams</u> Court explained that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  529 U.S. at 411; <u>accord</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75-76 (2003).  Section 2254(d)(1) imposes a "highly deferential standard for evaluating state-court rulings," <u>Lindh v. Murphy</u>, 521 U.S. 320, 333 n. 7 (1997)**,** that "demands that state court decisions be given the benefit of the doubt," <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24 (2002) (per curiam).  A federal court may not "substitut[e] its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d)."  <u>Id.</u> at 25; <u>Early v. Packer</u>, 537 U.S. 3, 11 (2002) (per curiam) (holding that habeas relief is not proper where state court decision was only "merely erroneous").

The only definitive source of clearly established federal law under AEDPA is the holdings (as opposed to the dicta) of the United States Supreme Court as of the time of the state court decision.  <u>Williams</u>, 529 U.S. at 412.  While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600-01 (9th Cir. 1999), only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied, <u>Williams</u>, 529 U.S. at 412; <u>Moses v. Payne</u>, 555 F.3d 742, 759 (9th Cir. 2009).  Furthermore, under § 2254(e)(1), factual determinations by a state court "shall be presumed to be correct" unless the petitioner rebuts the presumption "by clear and convincing evidence."

A federal habeas court conducting an analysis under § 2254(d) "must determine what arguments or theories supported, or, [in the case of an unexplained denial on the merits], could have supported, the state court's decision; and then it

must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." Harrington v. Richter, 562 U.S. 86, 102 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."). In other words, to obtain habeas relief from a federal court, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Id. at 103.

The Supreme Court has held that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). Here, Petitioner raised both of the FAP's grounds for relief on direct appeal. (LD 23.) The California Court of Appeal rejected them in a reasoned decision (LD 5), and the California Supreme Court subsequently denied review without comment or citation (LD 7). Accordingly, the Court looks through the California Supreme Court's denial and reviews the California Court of Appeal's reasoned decision under AEDPA's deferential standard. See Nunnemaker, 501 U.S. at 803; Reis-Campos v. Biter, 832 F.3d 968, 973-74 (9th Cir. 2016) ("[W]ith respect to evaluating the state court's reasoning, where a federal claim has been adjudicated in a reasoned decision, we 'look through' subsequent summary denials and review the last reasoned decision.").

**VI.**

**DISCUSSION**

**GROUND ONE:  THE TRIAL COURT'S DENIAL OF PETITIONER'S MISTRIAL MOTIONS.**

In his first ground for relief, Petitioner contends that the trial court violated due process and deprived him of his right to a fair trial by denying his mistrial motions based on the jurors' exposure to extrinsic information concerning his probation-violation case during voir dire.  (See Dkt. 6 at 5, 121.)

> A.     **The California Court of Appeal's Decision.**

The California Court of Appeal summarized the relevant facts underlying this claim as follows:

> *[Petitioner's] second trial proceeded in November 2016.  On November 15, 2016, during the fourth day of voir dire, an issue arose about the possibility that some prospective jurors had been exposed to outside information.  During questioning, Prospective Juror No. 13, volunteered that he had "read the board out front" and "saw the defendant's name and [a] couple things about him."  After questioning by the court, it was determined the juror was referring to the court's calendar posted on the door, which he read while the jurors were waiting to come into the courtroom.  He elaborated by saying the calendar identified the current trial "and then another charge" that had not been explained in court.*

> *The court asked the panel if anyone else had looked at the calendar or formed any opinions about it.  Prospective Juror No. 16 raised her hand and said "I don't have an opinion, but I did read it. I saw it."  No other juror raised his or her hand or otherwise responded to the court's question.*

> *The court spoke briefly with counsel at sidebar about the fact the calendar noted defendant's trailing probation violation case.  The court expressed concern about bringing too much attention to something that could be a nonissue.  The*

18

1  *parties agreed the court should ask some additional questions of Prospective Juror*
2  *No. 13 at sidebar and admonish the balance of the jurors.*

3          *When Prospective Juror No. 13 was asked, at sidebar, what specifically he*
4  *recalled reading, he said the calendar mentioned the present trial, but also noted*
5  *that defendant had been charged with a probation violation.  The court asked*
6  *whether he could disregard that information and not let it influence him.*
7  *Prospective Juror No. 13 said he did not think that information should have been*
8  *out there at all, but he would try to disregard it.  The court reminded him that*
9  *defendant was presumed innocent of all charges, including any probation violation.*
10 *Prospective Juror No. 13 responded, "Oh, so he — so it wasn't a done deal on that.*
11 *[¶] . . . [¶] . . . I just assumed that since it was up there that it was a — he'd*
12 *already been you know violated."  The court said it was simply a charging*
13 *document and defendant was presumed innocent.  The court asked again if he*
14 *thought he could be fair.  Prospective Juror No. 13 responded, "Just the fact that it*
15 *says probation on it has affected my judgment I think."  The court asked if either*
16 *side would like to ask additional questions and both sides declined.  Prospective*
17 *Juror No. 13 returned to his seat.*

18         *While still at sidebar, defense counsel asked for a mistrial, arguing that*
19 *Prospective Juror No. 13 made the initial statement about outside information in*
20 *open court, and it could have tainted the other jurors.  The court said the phrase*
21 *"probation violation" was not said in open court, only a reference to additional*
22 *information.  The court denied defendant's motion, finding insufficient grounds to*
23 *warrant a mistrial, but reiterated that it would admonish the jurors, and speak with*
24 *Prospective Juror No. 16 who had raised her hand indicating she had also read the*
25 *calendar.*

26         *At sidebar, Prospective Juror No. 16 said she just looked at the calendar*
27 *briefly but did not recall anything specific about what was printed on it.  When*

28

19

asked if anything about it would cause her to be unfair to defendant, she said no. She said it would not influence her if she was chosen as a juror and that she could be fair to both sides.  As she was being excused to return to her seat, she volunteered that other jurors were looking at the calendar even though they did not raise their hands when the court inquired about it.

Defense counsel renewed his motion for a mistrial, stating it appeared the possible taint was "a wide spread situation."  The court agreed to speak with each prospective juror individually.

Prospective Juror Nos. 1 through 4 all stated at sidebar they had not read the calendar and had not been influenced by any of the comments made in open court by their fellow jurors.  They all indicated they could be fair to both sides and follow the court's instructions.

Prospective Juror No. 5 said she had not read the calendar, but the discussion raised by the other jurors in court had made her curious.  She asked "is there another case out?"  The court admonished Prospective Juror No. 5 that she was not to speculate about such issues, and that she was to listen only to the evidence presented in court if she was seated as a juror.  The court asked if she could do that.  She said she would try, that she wanted to be fair, but it made her feel a little "weird."

After Prospective Juror No. 5 returned to her seat, the court, still at sidebar with counsel, expressed concern that calling up each juror individually was "drawing more attention to the issue at hand than need be."  The court therefore decided it was better to give "a general admonition, and inquire of the jurors whether or not they can follow the court's order, and not consider anything outside of any evidence that will be presented during the trial in this matter."  The court indicated it would allow counsel "an opportunity to voir dire on whatever issues they feel is [sic] relevant to the issue of potential jurors being unfair or biased."

*When the proceedings resumed, the court told the panel it was going to proceed with a general admonition in lieu of continuing with the individual sidebar discussions. The court then admonished the prospective jurors as follows.*

*"I'm going to ask, one, that you not speak to each other about anything you may have heard, saw, read, or the calendar or otherwise. Not speculate as to any evidence that may be presented in this case. If you're selected as jurors, the evidence that you will consider for deliberations will be evidence that come[s] from either this seat, meaning a witness is testifying, which is called evidence, or will be presented to you as evidence, or either side will present certain documentation, and you will be given instructions as to whether or not it is to be received for evidence. [¶] Anything other than that, I am ordering you not to consider, not to speculate, not to form any opinions. Remember, Mr. Mitchell is presumed to be innocent. There is no evidence that has been presented."*

*The court asked for a show of hands if anyone could not follow those instructions. Prospective Juror No. 5 raised her hand, and the court asked if that was based on the previous conversation at sidebar, and Prospective Juror No. 5 said yes.*

*Prospective Juror No. 7 said, "I didn't see it, or anything like that, but I overheard some things." The court asked if it was anything that would cause him/her to be unfair to defendant and Prospective Juror No. 7 said no.*

*The court re-read the charges, reiterating that they were just charges, that defendant was presumed innocent and that the prosecutor had the burden of proving each of those charges. "You are not to consider anything else presented unless it is presented for evidence. Any discussions, outside discussions that you have had, that is not to be considered in your deliberation, or your interpretation of the evidence as presented." The court then asked the panel, "Do you all agree to follow the court's order? Will you all be able to follow the court's order, and*

*continue to give Mr. Mitchell a fair trial?"*

*The prospective jurors collectively responded, "Yes. Yes."*

*The court asked if there was anyone who believed they could not follow those instructions, then noted for the record, "[n]o hands being shown except for Juror No. 5." The court allowed counsel to ask additional questions of the panel on the subject.*

*Prospective Juror No. 7 said she heard other jurors discussing the calendar, and it might affect her deliberations. The court allowed a brief sidebar with Prospective Juror No. 7 who said she heard another juror say that whatever was on the calendar probably meant that defendant was "probably guilty." Prospective Juror No. 7 was not involved in the conversation but overheard it. She believed there may have been three or four prospective jurors within "earshot" of the comment. The court emphasized no evidence of a probation violation had been presented, it was not an issue for the jury to consider, and any speculation about there being such a violation must not be considered. Prospective Juror No. 7 said she could be fair and would abide by the court's instructions.*

*Prospective Juror No. 9 said it possibly could affect her deliberations. At sidebar, Prospective Juror No. 9 said she had not read the calendar but hearing what Prospective Juror Nos. 13 and 16 said made her wonder about the possibility of another case. She asked if there was another case pending and the court said, "[n]o. This is the only case that you're to consider." When asked whether she could keep an open mind and listen to the evidence fairly, Prospective Juror No. 9 said yes.*

*Prospective Juror No. 13 said it possibly could affect his deliberations. Neither party asked him any follow-up questions.*

*Prospective Juror No. 16 reiterated that she would adhere to the court's instructions and the speculation and comments about the calendar would not affect*

1    *her.*

2    *Prospective Juror No. 19 said he believed he could follow the court's*
3    *instructions, but he would "still want to know what was going on." The court*
4    *interjected that jurors are not to speculate about outside issues, but are only to*
5    *consider the evidence presented, along with the court's instructions. The court*
6    *asked if he could follow that instruction. Prospective Juror No. 19 said he was not*
7    *sure because there was "no delete function in the human memory." The court*
8    *explained there is no delete function for our "common life experiences" either, but*
9    *as jurors everyone has to put that information aside and focus on the evidence*
10   *presented and evaluate the case before them. "I'm not asking you to erase your*
11   *memory. I'm asking you only if you're able to consider as evidence only what you*
12   *hear, and see in court, and that which is presented as evidence." Prospective Juror*
13   *No. 19 responded, "[i]f I understand you correctly, I can agree to that." He then*
14   *said, "I would set that aside, listen to the evidence fairly."*

15   *One of the prospective jurors still seated in the audience (No. 3854) said that*
16   *"everyone's just speculating" about what was on the calendar, but he did not hear*
17   *anyone speculating about defendant's guilt or innocence. He said he could follow*
18   *the court's instructions and be fair.*

19   *All of the remaining prospective jurors, including those in the audience who*
20   *had not yet answered the basic background questions, responded that they had not*
21   *read the calendar, had not heard any discussions about it, had not formed any*
22   *opinions and would follow the court's instructions.*

23   *After both sides had completed their questioning, defense counsel again*
24   *moved for a mistrial. The court denied the renewed motion for mistrial, explaining*
25   *that except for Prospective Juror No. 5, all of the prospective jurors affirmatively*
26   *stated they could put aside any outside influences. "I think the jurors were*
27   *forthright in what they either overheard, saw, or even speculate to [sic] and each*

28

23

1  *gave the court assurance[,] that is they would not allow that to influence their*

2  *judgment." On its own motion, the court excused Prospective Juror No. 5 for*

3  *cause because of her statements that the information had impacted her ability to be*

4  *fair.*

5       *The next day, jury selection resumed. Neither defense counsel nor the*

6  *prosecutor moved to excuse any prospective jurors for cause. Since Juror No. 5*

7  *had been excused, the court instructed Juror No. 13 to take her seat. Defense*

8  *counsel exercised only three of his remaining peremptory challenges, excusing*

9  *Prospective Juror Nos. 1, 5 (formerly Juror No. 13) and 6. Both the prosecutor*

10  *and defense counsel accepted the panel as then constituted. Prospective Juror No.*

11  *19 was excused, and Prospective Juror Nos. 17, 18 and 20 were sworn as*

12  *alternates.*

13  (LD at 3-10.)

14       The court of appeal rejected Petitioner's claim for two reasons. (Id. at 22-

15  24.) First, it found that he had forfeited any claim that biased jurors had been

16  permitted to serve on his jury by failing to move to excuse any juror for cause or

17  exhaust his peremptory challenges.[8] (Id. at 22-23.) Second, it held that the trial

18  court properly denied Petitioner's mistrial motions because no juror who stated that

19       [8] Citing this aspect of the court of appeal's decision, Respondent contends

20  that Petitioner's claim is procedurally barred. (See Answer at 31-33.) But

21  considering that Petitioner repeatedly moved for a mistrial based on the potential
jurors' exposure to the information concerning his probation-violation case (see

22  Aug. RT at 342-43, 348, 389), the procedural-bar question is at a minimum
complicated. By contrast, resolving the claim on its merits is not, as explained

23  below. Accordingly, in the interests of judicial economy, the Court declines to

24  address the procedural-bar question and instead addresses the merits of Petitioner's

25  claim. See Lambrix v. Singletary, 520 U.S. 518, 524-25 (1997) (holding that, in the
interests of judicial economy, federal courts may address an allegedly defaulted

26  habeas claim on its merits if the issue on the claim's merits is clear but the
procedural-default issues are not).

27

28

the information on the court calendar would affect his or her impartiality was permitted to serve on the jury and the trial court took steps to ensure that it did not. Specifically, the court of appeal stated:

> [T]he record does not establish any abuse of discretion by the trial court in denying [Petitioner's] oral motions for mistrial . . . [¶]  The court excused for cause the only juror who admitted to being unable to judge [Petitioner] fairly, Prospective Juror No. 5.  The court inquired of the jurors collectively and individually about whether they had seen or heard anything related to the court's calendar, and also allowed counsel to ask additional questions on the subject.  A majority of the prospective jurors said they had not noticed the calendar, and gave no indication their impartiality had been impaired.

> Prospective Juror Nos. 7, 9 and 16 said they had overheard some speculation about the possibility of another charge or case.  However, after questioning and admonitions from the court, all three prospective jurors confirmed they could listen to the court's instructions and give [Petitioner] a fair trial.  Prospective Juror Nos. 13 and 19 were the only other two jurors who said the information from the calendar might affect their judgment.  Both were excused.

> Moreover, the court thoroughly admonished the jury about the presumption of innocence, what constitutes evidence and their duty to disregard outside information.  [Petitioner] has not demonstrated any likelihood that a juror or jurors were actually biased against him.  Indeed, the jury acquitted [Petitioner] of the robbery on count 2, indicating the jury engaged in measured and thoughtful deliberations.

(Id. at 22-24.)

1

### B.        Applicable Federal Law.

2
3
4
5
6
7
8
9

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors.  U.S. Const. amend. VI; see Irvin v. Dowd, 366 U.S. 717, 722 (1961).  Pursuant to that right, criminal defendants are entitled to a jury that reaches a verdict based only on the evidence produced at trial.  Turner v. Louisiana, 379 U.S. 466, 472-73 (1965).   Indeed, "[d]ue process does not tolerate 'any ground of suspicion that the administration of justice has been interfered with' by external influence."  Godoy v. Spearman, 861 F.3d 956, 959 (9th Cir. 2017) (quoting Mattox v. United States, 146 U.S. 140, 149 (1892)).

10
11
12
13
14
15
16

When a court is confronted with an allegation of improper external influence on a juror, it "appl[ies] a settled two-step framework."  Id. (citations omitted).  First, it "asks whether the contact was possibly prejudicial, meaning it had a tendency to be injurious to the defendant."  Id. (internal quotations omitted).  Second, if it was, the court "proceeds to step two, where the 'burden rests heavily upon the [state] to establish' the contact was, in fact, 'harmless.'"  Id. (quoting Remmer v. United States, 347 U.S. 227, 229 (1954)).

17
18
19
20
21
22
23
24
25
26

An unauthorized communication "is possibly prejudicial . . . if it raises a risk of influencing the verdict."  Id. at 956.  Although this is "low threshold" to meet, the communication must nevertheless raise "a credible risk of influencing the verdict" to "trigger[] the presumption of prejudice."  Id.  The presumption does not, however, apply when the unauthorized communication or influence is de minimis.  Caliendo v. Warden of Cal. Men's Colony, 365 F.3d 691, 696, 697 (9th Cir. 2004) (explaining that brief, inadvertent encounters between jurors and witnesses generally do not give rise to presumption because "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote").

27
28

To distinguish between the two, the Ninth Circuit has identified the following

factors: (1) the extent to which the unauthorized communication concerned the case; (2) the length and nature of the contact; (3) the identity and role at trial of the parties involved; (4) the evidence suggesting the contact actually impacted the juror; and (5) the possibility of eliminating prejudice through a limiting instruction. Id. at 697-98.  No one factor is dispositive.  Id.  In weighing these factors, reviewing courts "generally accord some deference to the findings of the trial judge, who is in the best position to determine whether possibly prejudicial misconduct took place and, if so, whether the government clearly established harmlessness." Id. at 698.  By contrast, no deference is warranted when "an extrinsic contact was possibly prejudicial but the trial judge neglected to hold the government to its heavy burden of proving that the contact was clearly not prejudicial."  Id.

### C.  **Analysis.**

Irrespective of whether the exposure to the information on the court calendar concerning Petitioner's probation-violation was de minimis or sufficient to trigger the presumption of prejudice, it did not deprive him of his right to a fair trial or result in a biased juror sitting on his jury.  First, although the information on the court calendar concerned Petitioner, any exposure to it was limited.  Only two jurors – Juror Nos. 13 and 16 – actually read the information concerning Petitioner (see Aug. RT at 336-37, 340-42, 345),[9] and only one other juror – Juror No. 5 – gleaned that Petitioner had a second criminal case (see id. at 361-62).  None of those jurors served on the jury (see id. at 27-28[10] (reflecting that defense counsel

---

[9] Juror No. 19 stated that she had read "the title" of the calendar but "didn't read the lines under it."  (Aug. RT at 375.)  The calendar was removed once it was brought to the trial court's attention.  (See id. at 354.)

[10]  Both of the volumes of the augmented reporter's transcript are as designated as "Volume 1 of 1."  (LD 21 at 1; LD 22 at 1.)  For reasons unclear to the Court, the volume with lower page numbers (see LD 22 (containing pages one through twenty-nine of the Aug. RT)) reflects events that occurred later in time than

exercised peremptory strike against Juror No. 13), 28-29 (reflecting that the jury accepted by both parties did not include Juror No. 16), 391 (reflecting that the trial court removed Juror No. 5 on its own motion)), and the existence of Petitioner's probation-violation case was never mentioned in open court (see id. 337 (reflecting that the juror who raised the issue concerning the court calendar stated only that it contained "additional information" about Petitioner and waited to reveal that information until a sidebar), 343 (trial court noting that the same juror did not mention the probation-violation case in open court but rather revealed it "at sidebar out of the presence of the other jurors")). Compare Turner, 379 U.S. at 472 (improper contact was conclusively prejudicial when two deputy sheriffs who had provided key testimony against defendant were engaged in "a continuous and intimate association with the jury throughout trial"). Although Juror No. 19 – who neither read the calendar nor knew anything about the probation-violation case – stated that he was "curious" about "what was going on" (id. at 375), he too did not serve on the jury (see id. at 28-29 (reflecting that the jury both parties accepted did not include Juror No. 19)).

Second, there is no reason to believe that the information reflected in the court calendar biased any actual juror against Petitioner. None of them read the calendar, and at most a few potential jurors merely "speculat[ed]" about what it said. (Id. at 378-80.) Although Juror No. 7 overheard a few potential jurors say that Petitioner had violated his probation,[11] she did not know whether that was true. (See id. at 383-84.) What's more, the trial court affirmatively told her it was not. (See id. at 384.) Similarly, when Juror No. 9 inquired whether Petitioner had

those in the volume with higher page numbers (see LD 21 (containing pages 301 through 395 of the Aug. RT)).

[11] Juror No. 7 did not identify the jurors to whom she was referring. (See Aug. RT at 385-86.)

"another case against him," the trial court unequivocally told her, "No.  This is the only case that you're to consider."  (Id. at 387); see United States v. Gonzalez, 226 F. App'x 700, 702 (9th Cir. 2007) (court remedied any harm stemming from "two inadvertent suggestions of [defendant's] previous criminal contacts with law enforcement [that] triggered jury inquiries" by "affirmatively stating that [defendant] had no convictions and had no criminal history" (citations omitted)). No other juror who served on the jury indicated that they had overheard anything or drawn any conclusions about whether Petitioner had a second criminal case, let alone that it involved an alleged probation violation.

Moreover, the fact that Juror No. 7 and Juror No. 9 initially indicated that what they had either heard or suspected might affect their deliberations (see Aug. RT at 370-71, 381-84, 387) is not sufficient to show that Petitioner was denied his right to a fair trial.  The Supreme Court has never held that a criminal defendant is deprived of his Sixth Amendment rights whenever a juror indicates a willingness to fairly consider the evidence at trial despite initially equivocating on the ability to do so.  See Carey v. Musladin, 549 U.S. 70, 77 (where Supreme Court precedent gives no clear answer to question presented, "it cannot be said that the state court 'unreasonab[ly] appli[ed] clearly established Federal law'").  On the contrary, the Supreme Court has suggested that such circumstances give rise to no Sixth Amendment violation.  See Skilling v. United States, 561 U.S.358, 396-97 (2010). In Skilling, a juror testified that she was angry about the collapse of a company run by the defendant and that the company's collapse had forced her to forfeit her own retirement savings plan.  Id. at 396.  When asked about her views of the defendant's guilt in crimes arising from the company's collapse, the juror equivocated, stating that she lacked sufficient information to determine whether the defendant was "probably guilty."  Id. at 397.  The juror likewise equivocated on her ability to be fair and impartial, stating only that she "thought" she could be fair and impartial.

Id. Notwithstanding these responses, the Supreme Court held that the district court did not err in concluding that the juror was "fit for service." Id. Here, both Juror No. 7 and Juror No. 9 unequivocally declared that they could be fair to both sides once the trial court explained that there was no evidence of any probation violation or other criminal case and that "the only thing[s]" they could consider were the current charges against Petitioner. (Aug. RT at 384-85, 388.) Thus, pursuant to Skilling, both were fit to serve on his jury.

Third, there is no reason to believe that the information on the court calendar rendered any actual juror unable to assess the evidence against Petitioner fairly. Indeed, no juror – not even the one whom the court removed on its own motion (see Aug. RT at 391) – knew anything about the probation-violation case, and it never came up after the court questioned the jurors. See United States v. Allen, 435 F.3d 1231, 1236 (9th Cir. 2005) (co-conspirator's "isolated reference" to defendant having been "in jail" did not warrant mistrial); Virgo v. Frauenheim, 714 F.3d 511, 514 (7th Cir. 2018) ("brief and nondescript" reference to defendant's criminal history did not prevent the jury from fairly evaluating evidence); Mixon v. Gastelo, No. CV 15-9517 JAK (AFM), 2016 WL 2731680, at *10 (C.D. Cal. Apr. 7, 2016) (same), accepted by 2016 WL 2731689 (C.D. Cal. May 10, 2016). More importantly, when the issue arose, the trial court instructed the jurors to not consider anything other than the evidence presented at trial in deciding whether Petitioner was guilty or not, and all the jurors – other than the one whom the court removed on its own motion (see Aug. RT at 391) – declared that they would follow those instructions (see id. at 366-67, 369). See Mancuso v. Olivarez, 292 F.3d 939, 952 (9th Cir. 2002) (detective's testimony indicating that parole search was performed on petitioner's apartment did not warrant mistrial even though the trial court had prohibited any reference to his parole status, in part, because the court admonished the jury to ignore that aspect of the detective's testimony), overruled

30

on other grounds by <u>Slack v. McDaniel</u>, 529 U.S. 473 (2000); <u>Cook v. LaMarque</u>, 593 F.3d 810, 827-28 (9th Cir. 2010) (presuming that the jury followed the trial court's instructions to "base its decision on the facts and the law" and "disregard [] extrinsic information" when a juror had shared with fellow jurors comments she overheard between the defendant and his attorney undermining his theory of defense); <u>see also</u> <u>Thompson v. Borg</u>, 74 F.3d 1571, 1574-76 (9th Cir. 1996) (jury veniremen's announcement in front of potential jurors that he had read a newspaper article stating that the defendant had withdrawn his initial guilty plea was not prejudicial in part because the trial court took sufficient curative steps).

Fourth, the trial court's findings of facts further undercut Petitioner's claim that he was denied his right to a fair trial. After questioning the jurors concerning the information on the court calendar, the trial court found that their answers were truthful and that they could fairly consider the evidence at trial. (See <u>id.</u> at 391.) That finding, which was made after considering the jurors' testimony and observing their demeanor, was reasonable under the circumstances and is entitled to deference. <u>See</u> <u>Snyder v. Louisiana</u>, 552 U.S. 472, 477 (2008) (recognizing that determinations of credibility and demeanor lie "peculiarly within a trial [court's] province," and instructing courts to "defer to" trial court's determinations "in the absence of exceptional circumstances"); <u>Patton v. Yount</u>, 467 U.S. 1025, 1037 n.12 (1984) (explaining that "habeas courts owe special deference" to finding that juror can "render a verdict based on the evidence presented in court"); <u>see also</u> <u>United States v. Hanley</u>, 190 F.3d 1017, 1031 (9th Cir. 1999) ("[W]e must accord special deference to the trial judge's impression of the impact of the alleged misconduct."); <u>United States v. Bagnariol</u>, 665 F.2d 877, 885 (9th Cir. 1981) ("The trial judge is uniquely qualified to appraise the probable effect of information on the jury.").

Fifth, the trial court took affirmative steps to eliminate the possibility of any prejudice. It repeatedly instructed the jurors to presume that Petitioner was

innocent and consider only the evidence presented at trial in determining whether he was guilty or not.  (See id. at 366-67, 369.)   What's more, it prohibited them from discussing any information in the court calendar and ordered them not to "consider," "speculate," or "form any opinions" about anything not admitted as evidence.  (Id. at 367); see Mays v. Hedgpeth, No. 11–CV–5531 YGR, 2014 WL 6668163, at *23-24 (N.D. Cal. Nov. 24, 2014) (presumption of prejudice arising from juror's mid-deliberation statement to other jurors that petitioner had already been convicted and sentenced of the charged crime in a prior trial was rebutted when the trial court questioned the jurors concerning the statement and admonished them to disregard it and, thereafter, the jury deliberated for several more days before reaching its verdict);[12] cf. United States v. Marrufo, No. CR 17-976-TUC-CKJ, 2023 WL 142675, at *4 (D. Ariz. Jan. 10, 2023) ("one-time reference to [defendant's] possible incarceration due to a felony conviction was harmless" even though trial court gave no curative or limiting instruction (citations omitted)).  The trial court also allowed counsel to "voir dire on whatever issues they fe[lt] were relevant" to any potential juror being "unfair or biased" (id. at 365), and no juror who served on the jury indicated that they could not be fair or unbiased.  Further, the court instructed the jurors at the close of trial to base their respective decisions only on the evidence adduced at trial, presume Petitioner was innocent, and follow the court's instructions.  (See 2 CT at 482, 487.)  The jury is presumed to have followed those unambiguous instructions, see Weeks v. Angelone, 528 U.S. 225, 234 (2000), and Petitioner cites no evidence to rebut that presumption.

Finally, the jury's verdict shows that the information concerning Petitioner's

---

[12] Although the extrinsic information in Mays was relayed by a juror rather than from an external source, the court analyzed the petitioner's claim as both as a juror-bias claim and an external-influence claim and found the presumption of prejudice had been rebutted for both.  See 2014 WL 6668163, at *23-24.

probation-violation case – to the extent any juror knew or suspected that such a case existed – did not result in any prejudice.  Indeed, the jury acquitted him of one of the charged robbery counts (See 2 CT at 520), even though the victim there – like all of Petitioner's victims – was also an Asian woman who had visited her local bank alone before being robbed after she drove home (see 3 RT at 1816-21; see also 4 RT at 2103, 2429-32, 2459-62, 2454-56; 5 RT at 2720, 2812-13, 3007-08, 3040-41).  That fact if anything shows that the jurors carefully considered the evidence adduced at trial as to each charged count and reached their respective decisions based only on that evidence without regard to Petitioner's parole-violation case.  See Barren v. Hedgpeth, No. CV 07-6896-GHK (FFM), 2011 WL 5553980, at *11 (C.D. Cal. Oct. 5, 2011) (jury's decision to acquit petitioner on three counts "[r]ather than reflexively finding [him] guilty on all counts" showed that it "dispassionately and methodically evaluated the facts and applied the law to those facts"); Moore v. Chrones, 687 F. Supp. 2d 1005, 1033 (C.D. Cal. 2010) (petitioner convicted of petty theft with a prior and heroin possession suffered no prejudice from the jury learning that he had a prior conviction in part because jury acquitted him of robbery count); see also United States v. Young, 470 U.S. 1, 18 n.15 (1985) (jury's failure to convict defendant on most serious count showed that prosecutor's improper argument "did not undermine the jury's ability to view the evidence independently and fairly").  "Were it otherwise, the jury would not have hesitated to convict [P]etitioner on all counts."  Barren, 2011 WL 5553980, at *11.

Accordingly, the court of appeal's rejection of this claim was neither an unreasonable application of nor contrary to clearly established federal law.  As such, this claim does not warrant habeas relief.

33

**GROUND TWO: SUFFICIENCY OF THE EVIDENCE.**

In his second ground for relief, Petitioner contends that there was insufficient evidence to support his convictions for conspiracy, robbery, and attempted robbery.[13]  (See Dkt. 6 at 8, 121.)

**A.    The California Court of Appeal's Decision.**

The California Court of Appeal rejected Petitioner's sufficiency of the evidence claim on its merits.  First, as to the conspiracy count (Count One), it concluded that there was sufficient evidence to show that he and others conspired to commit robbery and took overt acts in furtherance of that conspiracy:

*[T]here was abundant circumstantial evidence of an agreement to commit robbery.  Several different undercover detectives testified about observing [Petitioner], on multiple days, acting in tandem with his two coconspirators, waiting outside of banks for female customers to leave, alone, and then trailing them home or to their place of business to be robbed.  Their coordinated conduct reasonably implied a common purpose, a tacit agreement.*

*The testimony from the undercover detectives about the surveillance operation was bolstered and corroborated by the videotaped surveillance footage, the security camera footage, the cell phone records and Detective Thompson's testimony regarding the tracking of [Petitioner's] and Baber's cell phones on the dates of the offenses and their regular communication during those time periods.  [Petitioner's] pretrial statement to Detective Wawryk also contained admissions*

---

[13] Petitioner does not identify which of his six convictions he is challenging and alleges no facts in support of this claim other than that his conviction for the robbery of Young Ok Hwang was based on a witness's conflicting statements.  (See FAP at 121 (referring only to Count Four); see also 2 CT at 466-67 (reflecting that Count Four concerned robbery of Ms. Hwang).)  Nevertheless, the Court assumes he intends to challenge all of his convictions, as he did on direct review.  (See LD at 2, 25-51.)

*supporting his participation in the conspiracy. This evidence provided a sufficient basis upon which the jury could reasonably infer the existence of an agreement to commit robbery. [Petitioner] cites no authority for the proposition that a record of the actual conversations between the conspirators was necessary, and we know of no such authority.*

*There was also ample evidence of overt acts taken in furtherance of the conspiracy . . . [Petitioner] argues the evidence showed only [Petitioner] and another car driving "in unison" without more. When viewed in its totality, the evidence showed a clear pattern of activity by [Petitioner] and his two coconspirators, engaged in over a period of months within the same geographic area, targeting Asian female bank customers who were by themselves. [Petitioner's] conduct in driving to a particular bank location, waiting outside with his coconspirators nearby in another vehicle, and then following, for several miles, a female customer home or to her place of business was more than sufficient to constitute an overt act taken in furtherance of the conspiracy. Any suggestion to the contrary is without merit.*

(LD 5 at 25-27.)

Second, the court of appeal held that sufficient evidence supported Petitioner's convictions for the robberies of Ms. Lim and Ms. Hwang (Counts Three and Four) as either a principal or an aider and abettor:

*There was ample evidence supporting [Petitioner's] guilt as an aider and abettor of the robbery of Ms. Lim . . . [¶] There was strong evidence demonstrating [his] presence at the scene and acting in concert with his coconspirators. [He] admitted to his ownership of the red Infiniti with the black top and black rims. A car that looked nearly identical to [Petitioner's] car was captured by the traffic camera footage following Ms. Lim's car near the vicinity of the bank. A similar car was also captured by the security footage from the Chen's*

*home near Ms. Lim's home at the time of the robbery.  This evidence was bolstered by the cell phone records and testimony of Detective Thompson as to the usage of [Petitioner's] cell phone at the relevant times, both in the vicinity of the robbery and communicating with Baber.*

*[Petitioner] argues that none of the security or surveillance footage showed the license plate number of the red car or the face of the driver of the car.  The lack of these additional details does not lessen the strength and impact of the above evidence or the totality of evidence presented about the pattern of behavior engaged in by the three coconspirators with respect to all of their victims.  Viewed collectively, along with the admissions made by [Petitioner] in his pretrial statement, the evidence was more than sufficient to support the jury's verdict.*

*As for count 4, the evidence presented as to the manner of how Ms. Hwang was robbed fit the pattern of behavior followed by [Petitioner] and his coconspirators with respect to all of the victims.  Moreover, Ms. Hwang testified that [Petitioner] was the individual who robbed her.*

*[Petitioner] argues that some of her testimony was inconsistent with the report by Mr. Canchari that the robber fled in a maroon car.  (Ms. Hwang said her attacker fled in a black car).  [Petitioner] also argues Ms. Hwang's testimony was inherently untrustworthy because she changed her testimony from the first trial at which she was unable to identify [Petitioner] in court.*

*However, Ms. Hwang explained that she did not identify [Petitioner] in the first trial out of fear of retaliation.  And, other than the color of the car, the testimony of Ms. Hwang was consistent with Mr. Canchari.  It was for the jury to decide the weight and credibility of her testimony . . .  Nothing here indicates any basis for disregarding the jury's decision to believe Ms. Hwang's testimony.*
(Id. at 27-29.)

Finally, the court of appeal held that sufficient evidence supported

Petitioner's three attempted-robbery convictions (Counts Five, Six, and Seven):

> As we have already explained above, the prosecution presented solid evidence of a clear pattern of concerted action by [Petitioner] and his two conspirators in a series of follow-home robberies in which Asian female bank customers, driving alone, were targeted.  Further, [Petitioner] made various admissions to Detective Wawryk in his pretrial statement, including a statement that is reasonably construed to be an admission by [Petitioner] of participating in the crimes, but denying any personal conduct in confronting any of the victims.  Taken together, this was strong evidence demonstrating an intent to rob the victims.

> There was also ample evidence showing direct acts, beyond mere preparation, taken by the three conspirators towards the accomplishment of the intended robberies.  Each of the attempted robbery victims was followed by [Petitioner] and his conspirators for several miles to their homes or places of business.  Each victim was followed until she got out of her car, and then each of the attempted crimes was "frustrated by extraneous circumstances."  Lydia Kim was followed to Master's Golf, where the security camera footage showed a red vehicle similar to [Petitioner's] car arriving in tandem with the car from which a male exited and followed Lydia Kim until confronted by the manager of Master's Golf.  With respect to both Ms. Le and Jieun Kim, [Petitioner] and his coconspirators parked outside the bank, waiting for them to leave, and then followed them for several miles.  This conduct was observed and attested to by several undercover detectives.  Ms. Le was followed all the way to her parking spot inside her workplace parking garage, at which point the attempt was frustrated by the presence of the parking attendant.  The attempt on Jieun Kim was frustrated by her ability to drive safely through a double-set of security gates upon her arrival home.

(Id. at 30-31 (citation omitted).)

37

**B.    Applicable Law.**

The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970); accord Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). Evidence is enough to support a conviction if, viewing it in the light most favorable to the prosecution, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Under Jackson, the reviewing court does not ask whether the evidence at trial established guilt beyond a reasonable doubt as to every essential element of a crime but instead asks whether any rational trier of fact could have so found. Id. The court must construe the evidence in the light most favorable to the prosecution to "respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995). Jury decisions are unreasonable under Jackson only when the jury's findings are "so insupportable as to fall below the threshold of bare rationality." Coleman, 566 U.S. at 656.

When a state court has issued a reasoned decision rejecting a sufficiency of the evidence claim under a standard "not contrary" to Jackson, the reviewing court owes "double deference" to the trier of fact and state court. Juan H., 408 F.3d at 1275; Long v. Johnson, 736 F.3d 891, 897 (9th Cir. 2013).

California's standard for determining the sufficiency of evidence is identical to the federal standard announced in Jackson. People v. Johnson, 26 Cal. 3d 557, 576 (1980). Therefore, the question on federal habeas review is whether the court of appeal unreasonably applied Jackson. Juan H., 408 F.3d at 1275. Reversal is proper only if the court of appeal's decision was objectively unreasonable.

38

Coleman, 566 U.S. at 655.

**C.    Analysis.**

The California Court of Appeal reasonably rejected Petitioner's challenges to the evidence supporting his convictions.  Each challenge is addressed in turn below.

### 1.    Conspiracy

In California, a conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act "by one or more of the parties to such agreement" in furtherance of the conspiracy.  People v. Morante, 20 Cal. 4th 403, 416 (1999).  The unlawful agreement at the core of the conspiracy charge need not be explicit or expressed in words but may consist of a tacit mutual understanding to commit a crime.  People v. Vu, 143 Cal. App. 4th 1009, 1025 (2006).  Thus, the existence of an unlawful agreement may be inferred from conduct, relationships, interests, and activities of the alleged coconspirators before and during the alleged conspiracy.  People v. Gonzalez, 116 Cal. App. 4th 1405, 1417 (2004).  The requisite overt act need not be a criminal offense, nor must it be committed by the defendant.  People v. Fenenbock, 46 Cal. App. 4th 1688, 1708 (1996).

Here, there was sufficient evidence to support Petitioner's conspiracy conviction.  First, his statements to the investigating detective supported a reasonable inference that he was part of a conspiracy to commit robbery.  Indeed, although he insisted that he did not personally rob the victims and believed he should not have been charged with "actual robbery," he answered, "Yeah," when asked if he was part of a "crew" working "in concert together" to identify victims at banks and follow them in order to rob them.  (Supp. CT. at 29, 33.)  He also assured the investigating detective that "nobody" used a gun (id. at 18) and declared that

"out of everybody, [he was] the most remorseful one" because he "grew up better" and "kn[ew] better" (id. at 33 (emphasis added).)  Additionally, he admitted that he owned a red Infiniti (see id. at 9, 11), which matched one of the cars that was used in several of the charged crimes (see, e.g., 4 RT at 2406-07, 2490-91, 2746-47; 5 RT at 2717, 2773), and indicated that he was willing to "snitch[]" on his co-conspirators in exchange for leniency (Supp. CT at 19; see id. at 27-28, 34, 377). And the fact that Petitioner and his companions carried out two robberies and attempted three others was itself strong evidence that they conspired to commit those crimes.[14]  See People v. Herrera, 70 Cal. App. 4th 1456, 1464 (1999) (explaining that "carrying out the agreed-upon crime" constitutes sufficient circumstantial evidence to prove existence of conspiracy to do so), disapproved on another ground in People v. Mesa, 54 Cal. 4th 191, 199 (2012).

Second, there was ample evidence to show that Petitioner took overt acts in furtherance of the conspiracy.  Phone records showed that he and Barber – one of Petitioner's co-conspirators – exchanged a high volume of calls immediately before and after the charged robberies, and GPS tracking placed both of them in the vicinities of the robberies and one of the attempted robberies.  (See 5 RT at 2782-2802, 2807).  Police were surveilling Petitioner and Barber when the other two attempted robberies occurred.  They witnessed Petitioner and Barber (along with at least one other individual) target their victims at local banks and, from there, follow the victims in two different cars for long distances, all the while driving in tandem. (See 5 RT at 2715-21, 2746-48, 2750, 2035.)  Similarly, a witness to the aftermath of the robbery of Ms. Hwang testified that he saw two cars driving in tandem away

---

[14] As related below, sufficient evidence supported Petitioner's convictions for the charged robberies and attempted robberies, despite Petitioner's claim that there was not.  (See Dkt. 6 at 121.)

1  from the victim's home.[15]  (See 4 RT at 2414-17; 5 RT at 2772.)

2  Moreover, Petitioner and his companions employed identical tactics in

3  targeting and following different robbery victims on different occasions.  See

4  Smyer v. Sherman, No. 2:20-cv-09659-JWH-PD, 2021 WL 8269098, at *4, *8

5  (C.D. Cal. Oct. 29, 2021) (sufficient evidence that petitioner conspired to murder

6  his pregnant girlfriend in part because attack leading to her murder "mirrored"

7  those before and after on a different woman who was pregnant with petitioner's

8  baby when both attacks occurred), accepted by, 2022 WL 1289261 (C.D. Cal. Apr.

9  22, 2019), cert. denied, Smyer v. Phillips, 144 S. Ct. 609 (2024); People v. Mullins,

10  19 Cal. App. 5th 594, 607 (2013) (upholding conviction for conspiracy to commit

11  theft at mall ATM when defendant had engaged in a scheme to rob people after

12  they withdrew money from ATMs on at least two occasions just weeks before

13  committing the charged crime).  Indeed, all the victims in the charged robberies and

14  attempted robberies were Asian women who had visited their local bank alone

15  shortly before being robbed (or being targeted for robbery).  (See 4 RT at 2103,

16  2429-32, 2459-62, 2454-56; 5 RT at 2720, 2812-13, 3007-08, 3040-41.)

17  In short, there was overwhelming evidence that Petitioner conspired with

18  others to commit robbery and took overt acts in furtherance of that conspiracy.

19  Accordingly, he is not entitled to relief on this claim.

20  **2.    Robbery**

21  Robbery is the "the felonious taking of personal property in the possession of

22  another, from his person or immediate presence, and against his will, accomplished

23  by means of force or fear."  Cal. Penal Code § 211.  Under California law, "a

24  person who aids and abets the commission of a crime is a 'principal' in the crime,

25

26  [15] Ms. Hwang identified Petitioner as the person who robbed her.  (See 4 RT

27  2475, 2477, 2487-88.)

28

and thus shares the guilt of the actual perpetrator." <u>People v. Prettyman</u>, 14 Cal. 4th 248, 259 (1996).  For aiding and abetting, the prosecutor must prove the defendant acted "with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." <u>Id.</u> "[I]n general, neither presence at the scene of a crime nor knowledge of, but failure to prevent it, is sufficient to establish aiding and abetting its commission." <u>See</u> <u>People v. Campbell</u>, 25 Cal. App. 4th 402, 409 (1994).  But a defendant's presence at the scene of the target crime, companionship with the principal, and conduct before and after the crime are among several factors that may be considered in determining whether the defendant had the requisite knowledge and intent for aider-and-abettor liability.  <u>Id.</u>

Here, neither of Petitioner's challenges to his robbery convictions warrants relief.  First, there was sufficient evidence to prove that, at a minimum, he aided and abetted the robbery of Ms. Lim.  As related above, he admitted he was part of a "crew" working "in concert together" to identify victims at banks and follow them in order to rob them.  (Supp. CT at 28-29.)  Like each of the victims he and his crew targeted (<u>see</u> 4 RT at 2103, 2429-32, 2459-62, 2454-56; 5 RT at 2720, 3007-08, 3040-41), Ms. Lim was an Asian woman who had visited her local bank alone shortly before being robbed (<u>see</u> 4 RT at 2016, 2103-05, 2109, 2113, 2147-49).  And as in each of the charged crimes, the person who robbed Ms. Lim did not act alone.  (<u>See</u> 4 RT at 2018-19, 2116).  More importantly, GPS tracking and phone records showed that Petitioner and Barber were both in the robbery's vicinity, drove away afterwards, and exchanged 22 phone calls that day.  (<u>See</u> 5 RT at 2793-96, 2801-02, 2807.)  What's more, phone records from Ms. Lim's phone, which was taken in the robbery, showed that her phone was used to call Barber.  (<u>See</u> 4 RT at 2113-14; 5 RT at 3012.)  Finally, a neighbor's video-security footage and nearby traffic-camera footage showed that one of the cars that followed Ms. Lim to her

1
2
3
4
5

home "very much resembled" Petitioner's car (5 RT at 3009, 3019-21; <u>see</u> 4 RT at 2124, 2136, 2150-67), which police later saw parked in front of Barber's home (<u>see</u> 4 RT at 2412-13; 5 RT at 3019-21).[16]  Given this evidence, the jury could reasonably infer that Petitioner robbed Ms. Lim or aided and abetted the person who did.

6
7
8
9
10
11
12
13
14

Second, there was sufficient evidence to prove that Petitioner robbed Ms. Hwang.  Of course, much of the foregoing evidence – including Petitioner's pretrial admissions and his modus operandi in selecting his victims and committing the charged crimes – supports a reasonable inference that he participated in the robbery of Ms. Hwang.  But on top of that, Ms. Hwang identified him at trial as the person who robbed her, and she testified that she was "sure" it was him.  (4 RT at 2474-75, 2487.)   That testimony alone was sufficient to establish his identity as the robber.  <u>See</u> <u>Bruce v. Terhune</u>, 376 F.3d 950, 957-58 (9th Cir. 2004) (testimony of single witness is sufficient to uphold conviction).

15
16
17
18
19
20
21
22
23

Moreover, that Ms. Hwang did not identify Petitioner at his first trial is of no consequence.[17]  (<u>See</u> Dkt. 6 at 121.)  The jury knew that Ms. Hwang had failed to definitively identify Petitioner at the first trial (<u>see</u> 4 RT at 2477); indeed, defense counsel read her prior testimony into evidence and questioned her about it.  (<u>See</u> <u>id.</u> at 2479-80.)  The jury also heard her explain that she chose not to identify him at the first trial – even though she had known then that he was the person who robbed her – because she had been "afraid" he might exact "revenge" against her if she had done so.  (4 RT at 2480-81, 2486-87.)  Because that explanation was not inherently implausible, Ms. Hwang's testimony was sufficient to prove Petitioner's guilt.  <u>See</u>

24
25

[16] Police began surveilling Barber after they determined that Ms. Lim's stolen phone had been used to call him.  (<u>See</u> 5 RT at 3012-19.)

26
27

[17] At Petitioner's first trial, Ms. Hwang testified that Petitioner "resemble[d]" the person who robbed her but did not definitively identify him.  (4 RT at 2480.)

28

Smith v. Horel, No. CV 08-8424-PSG (RC), 2010 WL 4536804, at *7 (C.D. Cal. Sept. 20, 2010) (single witness's testimony that petitioner was the person who shot him was sufficient to prove petitioner committed attempted murder even though the witness "wavered" under cross-examination concerning whether petitioner was the shooter), accepted by 2010 WL 4536866 (C.D. Cal. Oct. 29, 2010). Consequently, Petitioner's argument amounts to nothing more than an invitation to re-weigh the evidence at trial and intrude upon the jury's exclusive province to determine whether or not Ms. Hwang's testimony at the second trial was credible. Reviewing courts, however, are prohibited from doing either. See Goode, 814 F.2d at 1355.

### 3. Attempted Robbery

"An attempted robbery requires a specific intent to commit robbery and a direct, ineffectual act (beyond mere preparation) toward its commission." People v. Medina, 41 Cal. 4th 685, 694 (2007). The direct but ineffectual act need not, however, be an actual element of the crime. See id. As such, a completed theft is not required for an attempted robbery. See id.

Here, there was sufficient evidence to support each of Petitioner's convictions for attempted robbery. It bears repeating that he admitted that he was part of a "crew" working "in concert together" to identify victims at banks and follow them in order to rob them. (Supp. CT at 28-29.) And in each attempted robbery, as in the two charged robberies, Petitioner targeted the same type of victim – namely, Asian women who had just visited a local bank alone. (See 4 RT at 2103, 2429-32, 2459-62, 2454-56; 5 RT at 2720, 2812-13, 3007-08, 3040-41.) What's more, police witnessed the attempted robberies of Jieun Kim and Ms. Le and observed Petitioner and his co-conspirators using identical tactics in both. Specifically, they identified their targets at local banks, waited for the victims to leave, and thereafter drove separate cars in tandem while following the victims over long distances. (See 5 RT at 2715-21, 2746-48, 2750, 3025.)

44

Although police did not witness the attempted robbery of Lydia Kim, there was substantial evidence supporting a reasonable inference that Petitioner was one of the people who attempted to rob her.  Indeed, the person who followed her in the Master Golf's parking lot donned the same type of construction vest that Petitioner had worn when he robbed Ms. Hwang later that same day.[18]  (See 4 RT at 2437 (Lydia Kim testifying that the person who followed her in the Master Golf's parking lot was wearing a construction vest), 2467 (Ms. Hwang identifying the construction vest that police recovered from Petitioner's car as the "same vest" that he had worn when he robbed her).)  Additionally, GPS tracking showed that Petitioner and Barber were in the vicinity of where the attempted robbery of Lydia Kim occurred (see 5 RT at 2799-2801), and phone records show that they were in constant communication that day (see id. at 2798, 2802).  From this evidence, the jury could reasonably infer that Petitioner committed the attempted robbery.

Moreover, it is of no consequence that Petitioner and his co-conspirators never approached the victims in the attempted robberies because, in each, they were thwarted from doing so.  Indeed, in two of the attempted robberies, they were prevented from approaching their victims by the presence of third parties.  (See 4 RT at 2434 (Lydia Kim testifying that Master Golf's manager alerted her that she was being followed inside the parking garage); 5 RT at 2812-13 (Le testifying that she parked her car and immediately gave her keys to a nearby valet).)  And the third attempted-robbery victim lived in a home behind two separate security gates, one of which closed before the next opened.  (See id. at 2456 (Jieun Kim describing the "double gate system" at her home).)  As such, Petitioner and his companions never had an opportunity to confront her once she passed through the first gate.

---

[18] According to defense counsel, the construction vests were similar though not identical.  (See 5 RT at 3354.)

45

1    In short, there was ample evidence supporting each of Petitioner's

2  convictions.  Accordingly, the court of appeal's rejection of his sufficiency-of-the-

3  evidence claim was neither an unreasonable application of nor contrary to clearly

4  established federal law.

5                              **VII.**

6                             **ORDER**

7    Accordingly, IT IS ORDERED that Judgment be entered denying the First

8  Amended Petition.

9

10  DATED:  <u>March 26, 2024</u>                    _Karen E. Scott_____

11                                              KAREN E. SCOTT
                                                United States Magistrate Judge
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28